UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
HERBERT MIRANDA,

                Plaintiff,

                                        **MEMORANDUM & ORDER**

        - against -                      22-CV-4226 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Herbert Miranda ("Plaintiff") brings this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), against Defendant Commissioner ("Commissioner") of the Social Security Administration ("SSA"), seeking judicial review of the SSA's denial of his claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties have cross-moved for judgment on the pleadings. (Dkts. 9, 14.) For the reasons set forth below, the Court grants the Commissioner's motion and denies Plaintiff's motion. This case is therefore dismissed.

## BACKGROUND

### I.    Procedural Background

      On August 20, 2010, Plaintiff protectively filed for DIB, alleging that he was disabled beginning on June 30, 2002, with a date last insured ("DLI") of December 31, 2007. (Administrative Transcript ("Tr."), Dkt. 7, at 37, 92, 139.)[1] His application was denied on January 6, 2011. (Tr. 47–54.) Following a hearing in November 2011 (Tr. 20–36), Administrative Law

---

[1] All references to "Tr." refer to the consecutively paginated Administrative Transcript up to Tr. 778 (*see* Dkt. 7), and not to the internal pagination of the constituent documents. After page 778, the pagination restarts at 1 and runs through 242, because the record includes a second copy of the Administrative Transcript from Plaintiff's initial 2011-2012 SSA proceedings.

Judge ("ALJ") Margaret A. Donaghy found that Plaintiff had no severe impairments and, on May 24, 2012, denied his application. (Tr. 7–15.) The Appeals Council declined to review the ALJ's decision (Tr. 1–3), prompting Plaintiff to file an appeal in this court. *See Miranda v. Comm'r of Soc. Sec.*, 13-CV-03351 (NGG). At the joint request of the parties, on February 6, 2014, the Honorable Nicholas G. Garaufis approved a Stipulation and Order of Remand, reversing the Commissioner's prior denial and ordering further administrative proceedings, "including, but not limited to, the [ALJ] holding a supplemental hearing, evaluating all medical opinion evidence in accordance with 20 C.F.R. § 404.1527, including the opinion of Dr. Abel Akerman, and issuing a new decision." (Tr. 328–30.)

On remand, ALJ Robert C. Dorf held an administrative hearing on January 8, 2015, the second in Plaintiff's case. (Tr. 267–302.) Dr. Gerald Galst, a "medical impartial expert for the Social Security Administration," who was board certified in cardiovascular disease and general internal medicine, reviewed Dr. Akerman's treatment notes for Plaintiff from the relevant period, as well as a 2001 echocardiogram and a 2010 stress test, and testified as to Plaintiff's condition. (Tr. 284–91.) Dr. Galst testified that, during the period at issue, Plaintiff was "quite obese," had elevated blood pressure, type II diabetes without "any complications . . . or documented cardiovascular disease other than some mild hypertensions," but, ultimately, that there was nothing in the record "to indicate that [Plaintiff's residual functional capacity ("RFC")] was substantially limiting." (*Id.*) Dr. Galst further testified that that Plaintiff "could certainly lift 20 pounds regularly and occasionally up to 50 pounds," and that "there [was] no real documentation" that Plaintiff's subsequent diagnoses "were existent" between 2002 and 2007. (Tr. 298, 301–02.) Dr. Galst also reviewed cardiologist Dr. Barry Bellovin's treatment records, which spanned from September 27, 2011 through June 24, 2014; nothing in Dr. Bellovin's records changed Dr. Galst's

opinion regarding Plaintiff's RFC or limitations imposed by his medical conditions.  (Tr. 291.)
ALJ Dorf subsequently found that Plaintiff was not disabled because he could perform medium
work during the period of claimed disability.  (Tr. 335–48.)  This time, however, the Appeals
Council remanded the case, finding that the ALJ had failed to weigh the October 2010 and 2011
opinions of Dr. Akerman, which indicated that Plaintiff's disability could be traced back to
complaints starting in 2006.  (Tr. 351.)  The Appeals Council ordered the ALJ to "[g]ive further
consideration to" these potentially retrospective opinions and Plaintiff's maximum RFC, and, "[i]f
warranted by the expanded record, obtain supplemental evidence from a vocational expert."  (Tr.
352.)

On November 14, 2016, ALJ James Kearns held a third hearing in this case (Tr. 305–11),
and issued a decision finding that Plaintiff "had the [RFC] for a full range of medium exertion
during the period at issue," could perform his past relevant work, and was thus not disabled.  (Tr.
250–66.) On July 16, 2018, the Appeals Council declined to review Plaintiff's claim, and Plaintiff
again filed an appeal in this court.  (Tr. 244.)  On May 1, 2019, the Honorable LaShann DeArcy
Hall approved a Stipulation and Order of Remand filed by the parties, this time requiring the ALJ
to offer Plaintiff a new hearing, "take further action to complete the administrative record," and
"issue a new decision."  (Tr. 668.)  On remand, the Appeals Council instructed the ALJ to formally
weigh the testimony of Dr. Galst—whose testimony the Appeals Council described "as either
vague" or requiring "evidenciary [sic] reconciliation"—and of consultative examiner Benjamin
Kropsky, MD.  (Tr. 672–73.)

On April 27, 2020, ALJ Kearns held a fourth hearing in this matter.  (Tr. 661–66.)  Shortly
thereafter, on May 5, 2020, ALJ Kearns again issued an opinion denying Plaintiff DIB.  (Tr. 639–

60.)  On July 8, 2022, the Appeals Council again declined to review the ALJ's denial, prompting the instant appeal that is before this Court.  (Tr. 632–35.)

## II.    Factual Background

Plaintiff, born in 1951, was 50 years old at the alleged onset date of his disability, June 30, 2002.  (Tr. 25, 654.)  Plaintiff retired that year after 20 years of working as a police officer for the New York City Police Department.  (Tr. 143–44.)  After retiring, he worked intermittently—"on and off" for about a year—as a self-employed, licensed private investigator.  (Tr. 27–28, 33, 279, 506.)  Plaintiff reported working "two hours, three hours" per week, with weeks or months without any work at all.  (Tr. 33.)

Plaintiff reported that he began experiencing fatigue and discomfort and pain in his shoulder and back starting in 2005.  (Tr. 28.)  He took various prescription medications for his diabetes, high cholesterol, and hypertension, and aspirin for his pain.  (Tr. 28–29.)  Plaintiff reported having trouble walking because he "would get fatigued" and could only stand for "15/20 minutes" as of 2007.  (Tr. 30.)  Plaintiff could lift a gallon of milk, but nothing "really heavy." (Tr. 31.)  His shoulder pain, fatigue, and other symptoms worsened in 2007, which stopped Plaintiff from being able to fish.  (Tr. 281.)

Plaintiff began meeting with his primary care provider, Dr. Akerman, in April of 1992. (Tr. 153.)  Before the onset date (June 30, 2002), Plaintiff was diagnosed with hypertension and hyperlipidemia, and was prescribed a number of medications.  (Tr. 215.)  In November 2001, Plaintiff received an echocardiogram which showed a "normal" ejection fraction of 68%, "[m]ild fibrocalcific disease of the aortic valve and root," no aortic stenosis, and no other cardiac abnormalities.  (Tr. 190.)

Dr. Akerman was the only doctor that Plaintiff saw regularly during the relevant period. Dr. Akerman's contemporaneous notes described Plaintiff's elevated blood pressure, hyperlipidemia, and, as of August 29, 2005, diabetes. (Tr. 29.) Between September 28, 2004 and June 28, 2007—a span of less than three years—Dr. Akerman saw Plaintiff for treatment 17 times. (Tr. 208–29.) On August 28 and December 21, 2006, Dr. Akerman wrote in his treatment notes that Plaintiff could not lift heavy weights, but that he was otherwise "doing well." (Tr. 228–29.)

After 2007, Dr. Akerman continued to treat Plaintiff for the same conditions as well as dermatitis, erectile dysfunction, and difficulty sleeping. (Tr. 200–20.) In September 2009, Plaintiff complained of "severe back pain after lifting 'heavy stuff'" including "furniture." (Tr. 199.) On July 29, 2010, Dr. Akerman noted that Plaintiff had "no significant complaints." (Tr. 206.)

Plaintiff faced substantial cardiovascular challenges in 2010. In August of 2010, Plaintiff had triple bypass surgery. (Tr. 29.) On September 2, 2010, Dr. Akerman noted that Plaintiff was "much better, objective [and] subjective." (Tr. 206.) On October 21, 2010, Dr. Akerman completed a medical questionnaire in which he noted that Plaintiff had had a heart attack, "was found to have coronary disease with progressive angina syndrome," and had borderline diabetes. (Tr. 153.) Dr. Akerman also wrote that Plaintiff had a "history of cardiovascular problems dated from 6–7 years ago," that he was fatigued "when walking less than 2 [hours]," that Plaintiff's symptoms were subsiding after his surgery but were "still . . . noticeable," and that Plaintiff was "unable to work physical work," could carry a maximum of five pounds, could stand and/or walk for less than 2 hours per day, and could sit for two hours per day. (Tr. 154–59.) A 2010 EKG stress test showed evidence of myocardial ischemia, and was consistent with descending coronary

artery disease.  (Tr. 160.)  On July 7, 2011, Dr. Akerman noted that Plaintiff was "very upset" and in "distress," and that he "can't lift heavy weights."  (Tr. 203.)

On October 26, 2011, Dr. Akerman completed another medical questionnaire, noting that Plaintiff "has been physically limited for the past five years due to diabetes and [c]ardiovascular disease," and was "unable to work since 2006 due to" various heart illnesses as well as his diabetes mellitus.  (Tr. 171; *see also* Tr. 630 ("Patient has been physically limited for at least the past 5 years due to cardiovascular disease, and diabetes as well as low back pain, for which he takes analgesics.").)  Dr. Akerman also noted that Plaintiff could occasionally lift and carry 10 pounds, stand or walk two hours per workday, and sit fewer than six hours per day.  (Tr. 628– 30.)

As of 2010 and 2011, Plaintiff was receiving treatment from cardiologists Dr. Bellovin and Dr. Wesley Tzall, in addition to his ongoing treatment with Dr. Akerman.  (Tr. 172–79, 203, 546.) Plaintiff was also assessed twice by the consultative medical examiner, Dr. Kropsky, an internist, once in December 2011 and again in September 2014. (Tr. 632.)  In December 2011, Dr. Kropsky noted that, even after his triple bypass surgery, Plaintiff reported continued pain in his left shoulder, fatigue after walking two-to-three blocks or half a flight of stairs, and an inability to lift over ten pounds.  (Tr. 230.)  Dr. Kropsky observed that Plaintiff "appeared to be in no acute distress," with a normal gait and stance, and that he had "a mild to moderate limitation for prolonged walking and moderate limitation for climbi[ng] stairs secondary to fatigue and shortness of breath related to his cardiac status," among other findings.  (Tr. 232–40.)  Dr. Kropsky's September 2014 assessment described Plaintiff's limitations similarly to those described in the December 2011 assessment: Dr. Kropsky wrote that Plaintiff "has a moderate limitation for lifting and carrying," as well as "a moderate limitation with prolonged walking and climbing stairs secondary to the cardiac

6

condition." (Tr. 620.)  Dr. Kropsky found that Plaintiff could lift and carry less weight, and stand and walk for less time, than he could in 2011.  (*Compare* Tr. 235–36, 240 *with* 621–22, 626.)

## III.    The ALJ Decisions

In evaluating disability claims, the ALJ must adhere to a five-step inquiry.  The claimant bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If the answer is yes, the claimant is not disabled.  *Id.*  If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment.  *Id.* § 416.920(a)(4)(ii).  An impairment is severe when it "significantly limit[s] [the plaintiff's] physical or mental ability to do basic work activities."  *Id.* § 416.922(a).  If the plaintiff does not suffer from a severe impairment, then the plaintiff is not disabled.  *Id.* § 416.920(a)(4)(ii). If the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether the plaintiff has an impairment that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  *Id.* § 404.1520(a)(4)(iii); *see also id.* Pt. 404, Subpt. P, App'x 1.  If the ALJ determines at step three that the plaintiff has an impairment that meets or equals one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act.  *Id.* § 404.1520(a)(4)(iii).  On the other hand, if the plaintiff does not have such impairment(s), the ALJ must determine the plaintiff's RFC before continuing to steps four and five.  To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting."  *Id.* § 404.1545(a)(1).  The ALJ will then use the RFC finding in step four to determine

if the plaintiff can perform past relevant work.  *Id.* § 404.1520(a)(4)(iv).  If the answer is yes, the plaintiff is not disabled.  *Id.*  Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy.  *Id.* § 404.1520(a)(4)(v).  If the answer is yes, the plaintiff is not disabled; otherwise, the plaintiff is disabled and is entitled to benefits.  *Id.*

### A.  The Three Prior Unfavorable ALJ Decisions

In the first unfavorable ALJ decision against Plaintiff, in May 2012, ALJ Donaghy found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of June 30, 2002 through his DLI of December 31, 2007.  (Tr. 12.)  At step two, the ALJ determined that although Plaintiff had four "medically determinable impairments"—hypertension, diabetes mellitus, obesity, and hyperlipidemia—Plaintiff "did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities," and was capable of medium work.  (Tr. 12–13.)  Therefore, ALJ Donaghy found that Plaintiff was not disabled as of the DLI, and rejected his claim.  (Tr. 15.)

In the second unfavorable decision, issued in March 2015, ALJ Dorf concurred with ALJ Donaghy's finding that Plaintiff was not gainfully employed at step one.  (Tr. 340.)  At step two of the analysis, ALJ Dorf found that Plaintiff did have three severe impairments, but assessed Plaintiff's RFC as capable of "medium work with additional limitations."  (Tr. 341–43.)  ALJ Dorf concluded that although Plaintiff was unable to perform his past relevant work as a police officer, he was not disabled.  (Tr. 343.)

In ALJ Kearns's first unfavorable decision against Plaintiff—the third rendered against him in this matter, issued on November 25, 2016—ALJ Kearns found that, although Plaintiff had three "severe impairments," they did not individually or collectively amount to "the severity of

one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 256.) At step three, ALJ Kearns found that Plaintiff had the RFC to "perform the full range of medium work as defined in 20 C.F.R. 404.1567(c)" because "he could lift up to 50 pounds and in [an] eight-hour workday [he] could sit, stand, and/or walk up to six hours each." (Tr. 256.) ALJ Kearns considered Dr. Akerman's treatment notes "from 2002 through . . . 2009 (more than two years after the end of the period at issue)" and found "mostly routine examinations to monitor hypertension, diabetes, and weight," as well as "no more than occasional complaints, which were treated and resolved with medication, and few, if any, clinical findings other than occasionally high blood pressure, elevated glucose levels, and hyperlipidemia." (Tr. 260.) ALJ Kearns found no evidence of "organ damage or coronary artery disease," and noted that it was "not until July 2010 that the claimant reported a recent onset of left shoulder pain on exertion" that was revealed as "ischemia, left anterior descending coronary artery disease, and severe triple vessel disease, which required surgery." (*Id.*) ALJ Kearns also found that Plaintiff's work "in 2005, 2006, and 2007 as a private investigator . . . suggest[ed] that he was capable of higher functioning than alleged and . . . directly contradict[ed] Dr. Akerman's assessments for less than sedentary exertion issued on" October 21, 2010 and October 26, 2011.[2] (*Id.*) ALJ Kearns also relied on Plaintiff's self-reported daily functioning and "conservative" history of treatment. (Tr. 260–61.) ALJ Kearns accorded "some weight to Dr. Akerman's statements that the claimant had no limitations except for lifting 'heavy weights'" from August 3, 2006 and December 21, 2006, but "little weight" to Dr. Akerman's 2010

---

[2]   Plaintiff reportedly "acknowledged working in 2005, 2006, and 2007 as a private investigator" at the 2015 hearing (Tr. 260), but also testified that his work in 2005 and 2006 was part-time and that he made "very little money" from it. (Tr. 645.) At the 2020 hearing, Plaintiff testified that he only "worked as a private investigator in 2006 or 2007 for approximately two months, for two to three hours per week during those two months. (*Id.*)

and 2011 opinions because they were contradicted by his contemporaneous treatment notes and 2006 opinions.  (Tr. 261.)

### B.    The Instant Unfavorable ALJ Decision

On May 5, 2020, ALJ Kearns again denied Plaintiff's claim at steps two and three.  (Tr. 646.)  The ALJ found that Plaintiff's hyperlipidemia was a "non-severe impairment," since the record does not indicate that doctors treated it with medication or that it caused functional limitation.  (Tr. 645.)  ALJ Kearns further found that because "the record does not reflect any diagnoses, medical signs, or laboratory findings regarding these impairments until 2010," Plaintiff's other conditions—"left anterior descending coronary artery disease, coronary disease with progressive angina syndrome, myocardial ischemia, status-post triple bypass surgery, and low back pain"—were all "non-medically determinable impairments" that could not "be the basis for a finding of disability [during the claimed period of disability, June 2002 to December 2007]."[3] (*Id.*)  In the alternative, the ALJ found these impairments to be "non-severe" because, other than one September 2008 complaint about back pain, "the record reflects no diagnosis or treatment for these impairments during the period at issue."  (Tr. 645–46.)  The ALJ further found that none of Plaintiff's "severe impairments"—hypertension, diabetes, and obesity—met the requisite severity to render Plaintiff disabled under the Listings.  (*Id.*)

The ALJ then determined that Plaintiff had an RFC permitting "a full range of medium work," including his past relevant work as a police officer and "other jobs that existed in significant numbers in the national economy."  (Tr. 654–55.)  The ALJ based that determination on the finding

---

[3] ALJ Kearns wrote that "SSR 16-3p indicates that no symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment."  (Tr. 645.)

that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 647.)   The ALJ summarized each of Dr. Akerman's contemporaneous treatment record and found no "significant complaints," although Plaintiff "testified that, beginning in 2005 and 2006, he experienced shortness of breath with walking one block[,]" and that it would take him ten minutes to walk one block.  (*Id.*)  The ALJ also found that "the degree of limitation the claimant described in his daily activities, particularly from 2005 through 2007"—when Plaintiff said he had significant difficulty walking—is "inconsistent with the longitudinal evidence of record that does not support a finding that the claimant experienced intense symptomatology during the period at issue." (Tr. 649.)  Instead, the ALJ found that, during the relevant period, Plaintiff's obesity, hypertension, diabetes, and hyperlipidemia were well-controlled with medication prescribed by Plaintiff's primary care physician.  (*Id.*)  In addition to Dr. Akerman's medical opinions and treatment notes, the ALJ considered the 2011 and 2014 consultative examination opinions of Dr. Kropsky, and the testimony of non-examining expert Dr. Galst.  (Tr. 652–54.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits.  42 U.S.C. § 405(g); 42 U.S.C. § 1383(c).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera*, 697 F.3d at 151 (internal quotation marks omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and brackets omitted)).   In determining whether the Commissioner's findings are based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.*   However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).   If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. *See* 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam).   Ultimately, the Court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

## DISCUSSION

## I.      The ALJ Sufficiently Developed the Record

"[W]hether the ALJ has met his duty to develop the record is a threshold question" that must be determined before the Court reviews whether the ALJ's final decision is supported by substantial evidence. *Plaza v. Comm'r of Soc. Sec.*, No. 19-CV-3853 (DF), 2020 WL 6135716, at *15 (E.D.N.Y. Oct. 16, 2020).   Even where the plaintiff does not raise the issue, the Court "must independently consider the question of whether the ALJ failed to satisfy his duty to develop the Record." *Sanchez v. Saul*, No. 18-CV-12102 (PGG) (DF), 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 23, 2020), *report and recommendation adopted*, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020). "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117,

128 (2d Cir. 2008) (citations omitted).  This duty exists "even where, as here, the claimant is represented by counsel." *Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "Legal errors regarding the duty to develop the record warrant remand." *Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 (S.D.N.Y. 2015) (collecting cases).

### A.  Dr. Abel Akerman

Plaintiff argues that the ALJ should have asked Dr. Akerman for clarification as to his opinions before finding them inconsistent with the medical record, since doing so "might well have resolved the asserted inconsistencies, or . . . demonstrated that in reality there are no inconsistencies at all." (Dkt. 9-1, at 13–14.)  The Commissioner responds that the ALJ was under no such burden in this case, because "'a deficiency in reasoning by a treating physician is not the same as a gap in treatment records'" and therefore triggers no additional duty to develop the record. (Dkt. 14-1, at 24 (quoting *Schillo v. Kijakazi*, 31 F.4th 64, 76 (2d Cir. 2022)).)

Generally, where "the ALJ deem[s] the treating physician['s] opinions lacking in support, the ALJ should [seek] clarification from them regarding the deficiencies [he] perceive[s] in [the physician's] opinions." *McGill v. Saul*, No. 18-CV-6430 (PKC), 2020 WL 729774, at *4 (E.D.N.Y. Feb. 13, 2020) (citing *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010) (holding that "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion.")).  However, "the ALJ's duty to develop the record is not limitless, and where there are no obvious gaps in the records, the ALJ is not required to seek additional information." *Dorothy B. v. Comm'r of Soc. Sec.*, No. 21-CV-259 (EAW), 2023 WL 5992265, at

*9 (W.D.N.Y. Sept. 15, 2023) (citations and quotations omitted); *Puckett v. Berryhill*, No. 17-CV-5392 (GBD) (KHP), 2018 WL 6061206, at *2 (S.D.N.Y. Nov. 20, 2018) (same) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).  Of particular relevance, in *Schillo v. Kijakazi*, the Second Circuit found that, because "there was a complete record before the ALJ consisting of medical opinions, treatment notes, and test results . . . as well as [Plaintiff's] own testimony" from multiple administrative hearings, the ALJ was not required to seek further clarification from a treating physician about an opinion the ALJ had rejected due to "vague, undefined terms."  31 F. 4th at 76.

Here, the Court finds that because the record before ALJ Kearns in 2020—*i.e.*, the records and testimony accumulated over the course of four separate ALJ hearings and more than seven years—was sufficiently complete that ALJ Kearns was not required to further supplement the record to explain Dr. Akerman's backward-looking, vague statement in October 2011, made via a medical questionnaire, that Plaintiff "has been physically limited for the past five years due to diabetes and [c]ardiovascular disease," and was "unable to work since 2006 due to" various heart illnesses as well as his diabetes mellitus.  (Tr. 171; *see also* Tr. 630.)  Within the voluminous record that ALJ Kearns had before him when he issued his May 2020 decision were: a November 2001 echocardiogram showing largely normal results (Tr. 286); nearly three dozen pages of contemporaneous notes from Plaintiff's appointments with treating physician Dr. Akerman before, during, and after the period at issue (Tr. 195–229); two consultative examiner reports (Tr. 616–27, 670–74); a non-examining cardiology expert's opinion (Tr. 284–91); testimony from two different vocational experts (Tr. 82–83, 292–97); notes from two additional cardiologists who treated Plaintiff after his DLI (Tr. 172–76, 535–615); and three separate administrative hearings at which, *inter alia*, Plaintiff testified.  (*See* Tr. 25–33, 281–83, 307–10.)  Further, despite the extensive fact-

finding and administrative review process that Plaintiff has been afforded, neither Plaintiff nor his counsel have identified any missing records that the ALJ should have considered.  Indeed, when Plaintiff was given the opportunity to testify at the fourth ALJ hearing, before ALJ Kearns in April 2020, his attorney chose not to ask him any questions, stating that "the record is complete with both vocational, claimant testimony, and medical expert testimony as well."  (Tr. 665.)

The cases cited by Plaintiff for the proposition that the ALJ should have further developed the record by seeking clarification from Dr. Akerman as to the inconsistencies the ALJ perceived are clearly distinguishable from the present case.  *Rosa v. Callahan* involved a record that the district court had numerous reasons to believe was incomplete: a treating physician's "sparse notes which reflected . . . considerably fewer visits" than the ALJ had reason to believe had occurred; notes which were "wholly conclusory" and extremely brief; "a non-English speaking claimant represented only by a 'legal assistant,'" who was less likely to be able to comprehensively develop the record than an attorney; and references in the sparse notes to other physicians' treatment of the claimant, but no records from those other physicians.  168 F.3d at 79–80.  Like *Rosa*, *Colucci v. Acting Comm'r of Soc. Sec.*, No. 19-CV-1412 (KAM), 2021 WL 1209713 (E.D.N.Y. Mar. 31, 2021) involved treatment records that the ALJ was aware of but failed to request.  And in *Plaza*, 2020 WL 6135716, at *23, the ALJ substituted his own lay opinion for the treating physician's assessment of the claimant's MRI and X-ray images, intervening to create an "inconsistency" that could not have been apparent to a layperson on the face of the record.

In contrast, here, there is no indication that any of Plaintiff's treatment records are missing, "incomplete or illegible."  *Pratts*, 94 F.3d at 38.  Dr. Akerman's contemporaneous treatment notes from over a dozen visits for the period from June 2002 to December 2007 contain no reference to the observations that Dr. Akerman made in 2010 and 2011 about Plaintiff's disability possibly

dating back to 2006, and, as noted, Plaintiff has never identified over the course of four ALJ hearings any gap or sparsity in the treatment records that the ALJ should have remedied. Therefore, ALJ Kearns "did not err in failing to seek records that he had no reason to believe existed." *Santiago Sanchez v. Comm'r of Soc. Sec.*, No. 20-CV-7653 (LJL), 2022 WL 3152585, at *7 (S.D.N.Y. Aug. 8, 2022). The Court also finds that, given the relevant contemporaneous records ALJ Kearns had before him, the ALJ did not err by not seeking clarification from Dr. Akerman about the apparent inconsistency between his 2010 and 2011 opinions, and his treatment records from the claimed period of disability.[4]

Thus, the ALJ did not fail to adequately develop the record by failing to request additional information from Plaintiff's treating physician in this case.

### B. Dr. Benjamin Kropsky

Citing no case law, Plaintiff also argues that the ALJ should have contacted Dr. Kropsky, who twice assessed Plaintiff as a consultative examiner, to determine whether his medical opinions were retrospective. (Dkt. 9-1, at 15.) The Court disagrees.

20 C.F.R. § 404.1519p(b) requires that "[i]f the report [of a consultative examiner] is inadequate or incomplete, [the ALJ] will contact the medical source who performed the consultative examination, give an explanation of [the SSA's] evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." Here, however, Plaintiff has not established that Dr. Kropsky's reports were inadequate or incomplete. The

---

[4] The Court further notes that, at the 2015 administrative hearing, Plaintiff testified that "even ten years ago, you figure [Dr. Akerman] was 80 years old." (Tr. 281.) Since nearly ten years have passed since that statement, the Court has reason to believe that seeking to reach Dr. Akerman for clarification as to his 2006, 2010, and 2011 opinions would be futile. *See* 20 C.F.R. § 404.1520b(b)(2)(i) ("We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence."); *Prince v. Berryhill*, 304 F. Supp. 3d 281, 288 (D. Conn. 2018) (same).

medical questionnaires Dr. Kropsky filled out in 2011 and 2014—nearly four and seven years *after* Plaintiff's DLI, respectively—both included the following at Question 10, just above Question 11 and the signature line: "The limitations above are assumed to be your opinion regarding current limitations only. However, if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations, on what date were the limitations you found above first present?" (Tr. 240, 626.) Each time, Dr. Kropsky, who had otherwise comprehensively filled out both forms, left Question 10 blank, answered Question 11, and signed the bottom of the form. (*Id.*) Clearly, the plain text of Question 10 establishes that the opinions expressed in the form are presumed to apply only to "current limitations" unless the physician filling it out has "an opinion within a reasonable degree of medical probability" based on "sufficient information" and says as much in the blank. Therefore, Dr. Kropsky completed the 2011 and 2014 forms in their entirety, including both Question 10s, which he answered in both reports by leaving them blank.

Further, no treatment relationship existed between Plaintiff and Dr. Kropsky, and there is no evidence that Dr. Kropsky even had access to Plaintiff's medical records or that his report was based on anything other than his isolated examinations of Plaintiff in 2011 and 2014.

Thus, the ALJ was under no obligation to further develop the record created by Dr. Kropsky, and did not err by not doing so.

## II.    The ALJ's RFC Was Based on Substantial Evidence

Plaintiff contends that the ALJ's finding that he was capable of "medium work" was the product of numerous errors, including (1) the ALJ's decision to discount the opinions of Dr. Akerman, Plaintiff's treating physician, and Dr. Kropsky, who twice examined Plaintiff; and (2) instead basing the RFC on insubstantial evidence, including relying on the opinion of Dr. Galst, a

non-examining physician whose testimony, Plaintiff argues, was "a hodgepodge of errors and omissions" and whose ultimate conclusion that Plaintiff had an RFC for medium work was "utterly groundless." (*See generally*, Dkt. 9-1 at 8–9, 10–19.)  The Court disagrees and finds that the ALJ's RFC is premised on substantial evidence.

A.  The ALJ Did Not Improperly Discount the Opinion of the Treating Physician

"'The treating physician rule,'[5] as it is known, 'mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence.'"  *Miracolo v. Berryhill*, 286 F. Supp. 3d 476, 497 (E.D.N.Y. 2018) (quoting *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)). In determining the appropriate weight to assign a treating physician's opinion, "[f]irst, the ALJ must decide whether the opinion is entitled to controlling weight."  *Schillo*, 31 F.4th at 75 (citations omitted).  Second, "[i]f the opinion of the treating physician is not given controlling weight, the ALJ must apply a number of factors in order to determine the opinion's proper weight." *Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 245 (E.D.N.Y. 2020) (citing *Shaw*, 221 F.3d at 134). These factors include: "(i) the frequency of examination as well as the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating source's opinion; (iii) the opinion's consistency with the entire record; (iv) whether the treating source is a specialist; and (v) other relevant factors.  20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6)."  *Id.*; *see also Schillo*, 31 F.4th at 75 (describing these as factors ALJs "must explicitly apply").  "Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight

---

[5] Although, in light of the *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, (Jan. 18, 2017), the treating physician rule applies only to claims filed with the SSA before March 27, 2017, this case was filed in 2010.  Therefore, the treating physician rule applies to Plaintiff's claims.

she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician." *Perez v. Astrue*, No. 07-CV-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009); *Schillo*, 31 F.4th at 75 ("At both steps, the regulations require the ALJ to give 'good reasons'—i.e., reasons supported by substantial evidence in the record—for the weight she affords the treating source's medical opinion." (citations omitted)).

Here, ALJ Kearns discounted Dr. Akerman's August 28 and December 21, 2006 "opinions"—seemingly scrawled as contemporaneous treatment notes—that Plaintiff was unable "to lift heavy weights" (Tr. 228–29), because Dr. Akerman "documented no clinical observations on [these] visit[s], did not specify how much weight the claimant could lift, and did not state a reason for the inability to lift heavy weight." (Tr. 650.) The ALJ also accords "little weight" to Dr. Akerman's opinions that Plaintiff's disability may have dated back to 2006—rendered on October 21, 2010 and October 26, 2011 via medical questionnaires—on grounds that they are inconsistent with Dr. Akerman's "treatment records during the period at issue," were based on "the deterioration in the claimant's cardiac condition occur[ing] after the period at issue," and were rendered by a non-specialist. (Tr. 651–52.)

Here, the ALJ gave "good reasons" for according "little weight" to these four isolated opinions of Dr. Akerman. The ALJ considered the *Burgess* factors before discounting Dr. Akerman's opinion, noting that "[w]hile he has a longitudinal familiarity with the claimant as a treating physician since 1992[,] . . . he is not a specialist regarding the claimant's impairments . . . [and] his opinions are inconsistent with the treatment records." (Tr. 650.) Dr. Akerman's 2006 "opinions" regarding Plaintiff's inability to lift "heavy weights" were, as the ALJ noted, not tethered to any evidence in the contemporaneous treatment notes or otherwise; in fact, as the ALJ

wrote, Dr. Akerman also opined during the December 2006 visit—and at a visit in September 2006—that Plaintiff was "doing well." (*Id.* (citing Tr. 228–29).)

In determining that Dr. Akerman's 2010 and 2011 medical opinions were inconsistent with his treatment notes, the ALJ comprehensively summarized Dr. Akerman's treatment notes from Plaintiff's 17 visits between 2002 and the end of 2007, and found no reports of "musculoskeletal impairments . . . cardiovascular complications," or diabetic complications, and, at the same time, frequent reports that Plaintiff was doing well or that his hypertension was well-managed by his medication. (Tr. 649.) The ALJ also noted that Plaintiff was not referred to or treated by "any cardiologist or endocrinologist during the period at issue, which is consistent with his treatment records [indicating] that the claimant was doing well on his diabetic and cardiac medication" at the time. (Tr. 651.) Further, the ALJ noted that the heart attack, myocardial infarction, and stress test that Dr. Akerman cites in the 2010 opinion all "occurred after the period at issue," in concert with "the deterioration in the claimant's cardiac condition," which occurred after the DLI and resulted in Plaintiff's 2010 triple bypass operation and other cardiovascular complications. (*Id.*) The ALJ also found that Dr. Akerman's 2010 and 2011 conclusions regarding Plaintiff's limitations with lifting, carrying, sitting, walking, and standing, as well as his low back pain, were not corroborated by, or even mentioned in, Dr. Akerman's 2002 through 2007 treatment notes or otherwise. Thus, the ALJ did not err in assigning these retrospective opinions little weight given the evidence that Plaintiff's deteriorating condition began after his DLI and, per Dr. Galst's specialist opinion, the lack of contemporaneous corroborating evidence during the period at issue. *See Khan v. Astrue*, No. 11-CV-5118 (MKB), 2013 WL 3938242, at *17 (E.D.N.Y. July 30, 2013) (finding that ALJ did not commit error in granting treating physician little weight because ALJ

identified the treating physician, applied the *Burgess* factors, and found conflicting evidence in the record).

B.   The ALJ Did Not Improperly Discount Dr. Kropsky's Opinion

Dr. Kropsky's December 2011 and September 2014 opinions, based on consultative examinations of Plaintiff, suggested that Plaintiff was limited to "light-to-sedentary work."  (Tr. 235–40, 621–26.)  The ALJ accorded these opinions "little weight," since these examinations were conducted years after the period at issue, after Plaintiff's triple bypass surgery and myocardial infarction, and these opinions were "entirely inconsistent with the evidence of record during the period at issue."  (Tr. 653–54.)

"There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations," especially when substantial evidence supports the ALJ's decision not to adopt the consultative examiner's opinion.  *Pellam v. Astrue*, 508 F. App'x 87, 89–90 (2d Cir. 2013).  Further, while the burden on the ALJ for justifying his divergence from a consultative examiner's opinion is less than for diverging from a treating physician's opinion, most of the same evidentiary basis for discounting Dr. Akerman's opinion also applies to discounting Dr. Kropsky's opinion.  As with Dr. Akerman, the ALJ's careful parsing of the evidence available during the period at issue, and its inconsistency with Dr. Kropsky's findings years later, constituted "substantial evidence" that the ALJ properly relied upon to discount Dr. Kropsky's opinions.  Further, the ALJ's finding, discussed *supra*, that Dr. Kropsky's opinions did not apply retrospectively to the period at issue also constitutes a reasonable basis for discounting the examiner's opinion.

C.  The ALJ's RFC Determination Was Supported by Substantial Evidence in the Record

When determining the RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history."  *Stover v. Astrue*, No. 11-CV-0172 (RMB) (RLE), 2012 WL 2377090, at \*6 (S.D.N.Y. Mar. 16, 2012) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)).  As discussed *supra*, the claimant bears the burden of proving the first four steps of the five-step inquiry, while the burden at the fifth step is on the ALJ to show that "there is other gainful work in the national economy which the claimant could perform."  *Id.* at \*7 (citing *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

Here, the ALJ applied the correct legal standard and relied on substantial evidence to determine that Plaintiff had the RFC to perform "medium work" during the claimed period of disability.  The ALJ extensively reviewed the treatment records (*see* Tr. 647–49) and Plaintiff's testimony.  (Tr. 649.)  He then evaluated claimant's symptoms under the factors described in 20 C.F.R. § 404.15229(c)(3), and "note[d] that contemporaneous treatment records from during [sic] the period at issue do not reflect significant complaints, although the claimant testified that, beginning in 2005 and 2006, he experienced shortness of breath with walking one block."  (Tr. 647.)  Dr. Akerman's notes consistently describe Plaintiff's conditions as well-managed on his medication.  Further, Plaintiff does not argue that Dr. Akerman's contemporaneous treatment notes failed to document any reports from Plaintiff of limitations, pain, or cardiac difficulty.  Indeed, Dr. Akerman's notes do record less serious issues complained of by Plaintiff in addition to his three severe impairments (hypertension, hyperlipidemia, and diabetes mellitus)—e.g., erectile dysfunction, a "cold," and pain from "lifting 'heavy stuff'" such as "furniture."  (Tr. 199–205.)  Given the thoroughness of Dr. Akerman's notes, there is no basis for concluding that he failed to

record more serious complaints or issues, such as debilitating fatigue, acute pain, difficulty walking and sitting, and breathing or cardiac issues.

Some of the limited evidence in the record that Plaintiff experienced more acute symptoms—for example, the aforementioned difficulty walking beginning in "2005, 2006"—exists in Plaintiff's own retrospective administrative hearing testimony. (Tr. 310.) For example, in 2016, Plaintiff further contextualized his comment that he "couldn't walk" starting in "2005, 2006" as follows:

> 2007, I would walk a block and it would take me 10 minutes . . . I was out of breath and then I had to take it easy. That's when I started going to Doctor Akerman [sic], so he's telling me, you got to go for this, you got to do this, and you got to go for that.

(*Id.*) Plaintiff's testimony largely does not evince significant limitations or limitations lasting the entirety of the period at issue, beginning in 2002. In 2015, Plaintiff testified that in 2007 he had "started having problems fishing" and ultimately had to stop fishing because he "would feel tired" and had pain in his "shoulder and . . . hand." (Tr. 281, 283.) At his 2011 administrative hearing, Plaintiff testified that in 2007, he "would get fatigued," could only walk or stand "15/20 minutes" at a time before needing a rest, and "would start to feel discomfort in [his] shoulder, but [he] shrugged it off" because "it's not great shakes." (Tr. 30.)

Plaintiff's testimony as to his disabilities was largely vague and, again, uncorroborated by his contemporaneous treatment notes. Even if Plaintiff's testimony was more indicative of acute disability, the ALJ, as the factfinder, is entitled to decide how to credit that evidence against the rest of the record. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." (citation and quotation marks omitted)).

Next, as described *supra* Discussion Sections II.A and B, the Court appropriately considered the testimony of the treating physician and consultative examiner.  Further, contrary to Plaintiff's contention, the ALJ also did not err in granting "partial weight" to Dr. Galst's 2015 opinion that Plaintiff did not face substantial limitations during the period at issue.  Although the "Second Circuit has found remand appropriate when an ALJ relies on a non-examining medical expert to override the opinions of treating physicians and the non-examining medical expert does not consider the entirety of the Plaintiff's medical records," *Murphy v. Berryhill*, No. 17-CV-0916 (JMA), 2019 WL 1075605, at *7 (E.D.N.Y. Mar. 7, 2019) (citing *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 200 (2d Cir. 2010) (summary order)), here, Dr. Galst did review all of Plaintiff's contemporaneous medical records, including Dr. Akerman's treatment notes and Plaintiff's 2001 echocardiogram, which showed "normal" ejection fraction and insignificant fibrocalcific disease. (Tr. 286–87.)  Dr. Galst's specialist assessment as a cardiologist of Dr. Akerman's and Dr. Bellovin's records, and his opinion that "there's no real documentation that" Plaintiff's later limitations "were existent" during the relevant period, and that claimant was able to perform "at least light or medium-level work" throughout the period at issue was far more in line with Dr. Akerman's own contemporaneous treatment notes and the substantial evidence in the record, than were Dr. Akerman's retrospective opinions.  (Tr. 284–91, 302.)  Therefore, the ALJ was "entitled to rely" on the non-examining expert's opinion.  *See Grisel A. v. Kijakazi*, No. 20-CV-00719 (TOF), 2021 WL 4350565, at *7 (D. Conn. Sept. 24, 2021); *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record." (citing 20 C.F.R. § 416.927(e)(2)(i))).

Furthermore, the ALJ only accorded Dr. Galst's opinion "partial weight," which is in keeping with the skepticism with which courts in this Circuit generally view non-examining consultant opinions.  *See Soto v. Comm'r of Soc. Sec.*, No. 19-CV-4631 (PKC), 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020) ("Courts in this Circuit long have casted doubt on assigning significant weight to the opinions of consultative examiners when those opinions are based solely on a review of the record.").  The ALJ discounted Dr. Galst's opinion because his opinion that Plaintiff was capable of "at least light or medium-level work"—while "clear" in "colloquial language"—was technically "vague or offer[ed] two residual functional capacities."  (Tr. 652.)

Lastly, the ALJ did not err in making an RFC finding without affording controlling weight to any of the physicians' opinions.  *Schillo*, 31 F.4th at 78 (rejecting claimant's "argument that, having declined to afford controlling weight to any of the three physicians' opinions, the ALJ was thereby prohibited from making an RFC finding whatsoever").  Because the ALJ's finding is consistent with the record as a whole, the Court finds that his RFC determination is supported by substantial evidence.  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

## CONCLUSION

For the foregoing reasons, this Court grants the Commissioner's motion for judgment on the pleadings.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED:

*/s/ Pamela K. Chen*
PAMELA K. CHEN
United States District Judge

Dated: September 29, 2023
      Brooklyn, New York